# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FERNANDO REAL, | |
| Plaintiff, | CIVIL ACTION NO. 3:13-cv-01054 |
| v. | (BRANN, J.) |
| | (SAPORITO, M.J.) |
| C/O HUBER, et al., | |
| Defendants. | |

## REPORT AND RECOMMENDATION

This civil action was initiated by the filing of a *pro se* complaint by the plaintiff, Fernando Real, on April 23, 2013. (Doc. 1). At the time of filing, Real was incarcerated at SCI Graterford, located in Montgomery County, Pennsylvania. At the time of the events alleged in the complaint, Real was incarcerated at SCI Camp Hill, located in Cumberland County, Pennsylvania.

## I.  PROCEDURAL HISTORY

On April 23, 2013, the Court received and filed the handwritten *pro se* civil complaint, signed and dated by the plaintiff on April 17, 2013. (Doc. 1). In his complaint, he asserted several federal civil rights claims concerning substandard living conditions at SCI Camp Hill in violation of his Eighth Amendment rights, the denial of adequate medical care in

violation of his Eighth Amendment rights, the unlawful seizure and destruction of certain legal materials in violation of his constitutional right of access to the courts,[1] the unlawful seizure and destruction of personal property (both legal and non-legal materials) in violation of his Fourteenth Amendment due process rights[2] and in retaliation for the exercise of his constitutional right of access to the courts, the issuance of an allegedly fabricated misconduct in retaliation for the exercise of his constitutional right of access to the courts, and procedurally defective disciplinary proceedings in violation of his Fourteenth Amendment due process rights. (*Id.*). In addition, Real asserted a state law intentional infliction of emotional distress claim and a state civil rights claim under 42 Pa. Cons.

---

[1] The complaint identifies the plaintiff's right of access claims as arising from the First Amendment. Although the basis of the right of access to the courts has been described as "unsettled," *Christopher v. Harbury*, 536 U.S. 403, 415 (2002), in the Third Circuit, courts have considered these claims under the Substantive Due Process Clause of the Fourteenth Amendment. *See Estate of Smith v. Marasco*, 318 F.3d 497, 511 (3d Cir. 2003); *Kuniskas v. Walsh*, Civil Action No. 3:09-CV-120, 2010 WL 1390870, at *4 n.1 (M.D. Pa. Apr. 1, 2010).

[2] The *pro se* complaint asserts this claim as a violation of the plaintiff's rights under the Pennsylvania state constitution, but both the Court and the defendants have liberally construed it as a federal due process claim. *See generally Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244–46 (3d Cir. 2013) (discussing a court's obligation to liberally construe *pro se* pleadings and other submissions, particularly when dealing with imprisoned *pro se* litigants).

Stat. § 8309.[3] (*Id.*). The complaint sought declaratory and injunctive relief, as well as an award of compensatory and punitive damages. (*Id.*). Shortly after the complaint was filed, Real applied for and was granted *in forma pauperis* status. (Doc. 4; Doc. 7).

On February 18, 2014, a federal magistrate judge recommended that certain claims be dismissed on the motion of the defendants. (Doc. 32). On August 29, 2014, the presiding district judge adopted the magistrate judge's recommendation with some modification, dismissing the plaintiff's Eighth Amendment claims regarding both substandard living conditions and denial of medical care, his due process claim with respect to disciplinary proceedings, his retaliation, access-to-courts, and property due process claims as against supervisory defendants, and his state law tort claims. (Doc. 35). The matter was remanded for further proceedings before a magistrate judge against the remaining defendants[4] on the plaintiff's

---

[3] This state statute provides a private civil cause of action for ethnic intimidation resulting in personal injury or property damage. *See generally* 18 Pa. Cons. Stat. § 2710. The complaint did not allege any facts in support of an ethnic intimidation claim, but simply cited the statute.

[4] The remaining defendants include: Unit Manager Rodney Carberry, Unit Manager Christopher Chambers, Lieutenant Bryan Gardner, Sergeant Clair Boring, Sergeant Thomas Cook, Corrections Officer ("CO") Adam Huber, CO Dennis King, CO Jesse Stum, and Corrections Trade *(continued on next page)*

retaliation claims, his access-to-courts claims, and his due process claim regarding lost or destroyed property. (*Id.*).

On January 8, 2015, the Court received and filed a motion for leave to file a supplemental complaint, signed and dated by the plaintiff on January 2, 2015. (Doc. 49; *see also* Doc. 50). *See generally* Fed. R. Civ. P. 15(d). On January 16, 2015, the Court granted the plaintiff leave to file his proposed supplemental complaint. (Doc. 53). In this supplemental complaint, Real provided additional factual allegations with respect to his retaliation and access-to-courts claims. (Doc. 54). He also asserted an additional legal claim that the loss or destruction of his legal documents violated his Sixth Amendment right to present a defense at his February 2014 murder trial. (*Id.*).

On March 9, 2015, the plaintiff filed a motion for partial summary judgment, seeking a ruling on his retaliation and access-to-courts claims against defendant Huber and his retaliation claim against defendant King. (Doc. 61; *see also* Doc. 62; Doc. 63; Doc. 64; Doc. 65; Doc. 71; Doc. 72). On March 27, 2015, the defendants filed a motion for summary judgment on the merits of Real's retaliation claims, his access-to-courts claims, and his

---

Instructor ("CTI") Bear.

due process claim regarding lost or destroyed property. (Doc. 66; *see also* Doc. 67; Doc. 68; Doc. 69; Doc. 70; Doc. 74; Doc. 75; Doc. 77). These motions are fully briefed and ripe for decision.

## II.   MATERIAL FACTS

The plaintiff's claims concern events that occurred while he was incarcerated at SCI Camp Hill between November 2011 and March 2012. At that time, Real was several years into a life sentence for the murder of Levon Wilson. He was also facing separate charges for the September 2002 murders of Marcus Herbert and Byron Story, which did not go to trial until February 2014.

In November 2011, the plaintiff was assigned to a cell in SCI Camp Hill's Special Management Unit ("SMU"), a housing unit specially designed to securely house inmates who exhibit behavior that is continually disruptive, violent, dangerous, or a threat to the orderly operation of the facility; SMU inmates are typically confined to their cells twenty-three hours a day and ordinary prison privileges are seriously restricted.[5] One such restriction is that SMU inmates are generally permitted to possess no more than one box of written material in their

_____

[5] *See generally Beard v. Banks*, 548 U.S. 521, 525–26 (2006).

cells.

Real had apparently filed one or more formal grievances complaining about the living conditions in the SMU and the denial of his requests to staff for medical evaluation and treatment as a result of the substandard living conditions in the SMU. Real claims that, on an unspecified date, in retaliation for these grievances, CO Stum refused to call medical to examine Real when he complained that he had a migraine headache and was coughing up blood. He further claims that, in retaliation for one or more of these grievances, Sergeant Cook threatened to stop Real from using the prison law library to file grievances, and he threatened to ensure that Real failed the SMU program. Both defendants have categorically denied these accusations.

On January 16, 2012, while Real was out of his cell for a shower, CO King—a corrections officer trainee at the time—conducted a security inspection of Real's cell. In a box in the cell, CO King reportedly found a steel shank, about 5 to 8 inches long, sharpened to a point at one end and wrapped in a sheet on the other end. CO King reportedly informed Sergeant Boring and Lieutenant Gardner, the supervisors on duty at the time, and they entered the cell to view the shank. Lieutenant Gardner

reportedly took possession of the shank, bagged it and sent it to the security office. CO King subsequently issued a written misconduct report, charging Real with possession of a dangerous weapon, possession of contraband, and failure to report contraband. At a misconduct hearing on January 19, 2012, a hearing examiner found Real guilty of possession of contraband and failure to report contraband, sanctioning him with 90 days of disciplinary custody. Real admits that the misconduct report was issued and that he was sanctioned, but he disputes the existence of the steel shank, contending instead that, in retaliation for filing his earlier grievances, King fabricated the misconduct report at the direction of Lieutenant Gardner, Sergeant Boring, and Sergeant Cook. All four defendants have categorically denied these accusations.

Upon issuance of the misconduct report, all of Real's personal property was confiscated to permit the property officer, CO Huber, to conduct a thorough search of the property for contraband, with the expectation that non-contraband items would be returned to Real after his misconduct hearing. As an administrative matter, Real's custody status was also changed from "Phase 4 AC" to "Phase 5 DC," which is the most restrictive level of custody in the SMU. CO Huber subsequently completed

an inventory of the confiscated property on January 30, 2012. Certain items were destroyed as contraband, and others were placed in storage in the SMU property room.[6] Prior to the misconduct, Real had two boxes of written material in his cell, despite prison policy limiting SMU inmates to one box of materials. CO Huber returned one box of written materials to Real, sending the excess materials to storage. Real claims that he had a written exemption from a previous superintendent that authorized him to possess an extra box of written materials due to his ongoing criminal and civil litigation, that CO Huber destroyed this written exemption along with two magazines and some legal papers in retaliation for his filing of grievances regarding the confiscated property, and that CO Huber deliberately omitted the exemption and destroyed legal papers from his written inventory. CO Huber has categorically denied these accusations.

Among the purportedly destroyed legal documents was an affidavit pertaining to Real's pending murder trial. Real claims to have received an

---

[6] The destroyed items were primarily food items that are prohibited for Phase 5 DC inmates, but also two tattered magazines and a nude photo. The stored items included 31 photos (in excess of the 10 photos allowed for Phase 5 DC inmates), and various books and legal papers.

unsolicited affidavit in the mail from "Lisa" in November 2011.[7] In addition to providing Lisa's full name, address, and date of birth, the affidavit stated that Lisa saw another individual—Terrell Boyd, the primary witness against Real at his February 2014 trial—shoot Marcus Herbert and Byron Story. Real testified at his deposition that he did not share a copy of this affidavit with his criminal defense lawyer, James Lammendola, at the time because he did not trust Lammendola or agree with his defense strategy. Lammendola was later replaced as Real's defense counsel by Gerald Stein, who represented Real at trial in February 2014. Real testified that he advised Stein of the affidavit he had received from Lisa, but without her full name, address, or date of birth, Stein was unable to locate her to testify at Real's trial. Without the "Lisa" affidavit, Real was convicted of first-degree murder on testimony by Boyd that

---

[7] In his pleadings and at deposition, Real discussed two other affidavits, which apparently pertained to a potential alibi defense, but he has failed to provide any details with respect to the contents or importance of these affidavits in his pleadings, at deposition, or in his summary judgment papers, and his summary judgment papers appear to focus solely on the "Lisa" affidavit. Real further claims that this "Lisa" was the same person referenced in a witness statement provided to police by Darlisa Norris on the day of the murders in September 2002, in which Norris stated: "I was told by my cousin, Kotoria, that Lisa told her that she had seen the black car park at the Thriftway parking lot and seen the guys follow [victims Herbert and Story] onto [Herbert's] porch." (Doc. 63-1, at 4).

placed Real in the area at the time of the shootings, and he was sentenced to his second and third life sentences for the deaths of Herbert and Story. *See Commonwealth v. Real*, Docket No. CP-51-CR-0008526-2008 (Philadelphia C.C.P.). That conviction and sentence remain pending on direct appeal to the Superior Court of Pennsylvania. *See Commonwealth v. Real*, Docket No. 2690 EDA 2014 (Pa. Super. Ct.).

In connection with his disciplinary sanctions, Real was also restricted from using the "mini law library" while in disciplinary custody. As a result, he contends that he was unable to adequately research legal arguments in support of a *pro se* motion for return of seized property pending in state court. *See In re Real*, Docket No. CP-51-MD-0012104-2011 (Philadelphia County C.C.P.). Real brought this action in November 2011 seeking the return of approximately $900 in cash seized from him when he was arrested. The Commonwealth moved to dismiss his motion on January 4, 2012, and Real filed his response to the dismissal motion on or about February 15, 2012, while in disciplinary custody. On February 28, 2012, the state court denied Real's motion for return of property.

## III.   LEGAL STANDARDS

### A. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by

the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251–52.

"The rule is no different where there are cross-motions for summary judgment." *Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008).

> Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.

*Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968). Thus, "when presented with cross motions for summary judgment, the Court must consider the motions separately, and view the evidence presented for each motion in the light most favorable to the nonmoving party." *Borrell v. Bloomsburg Univ.*, 63 F. Supp. 3d. 418, 433 (M.D. Pa. 2014) (citation omitted). "[E]ach movant must demonstrate that no genuine issue of material fact exists; if both parties fail to carry their respective burdens, the court must deny [both] motions. *Quarles v. Palakovich*, 736 F. Supp. 2d 941, 946 (M.D. Pa. 2010) (citing *Facenda v. N.F.L. Films, Inc.*, 542 F.3d

1007, 1023 (3d Cir. 2008)).

## B. *Sua Sponte* Dismissal Standard

Under 28 U.S.C. § 1915A, the Court is obligated to screen a civil complaint in which a prisoner is seeking redress from a governmental entity or an officer or employee of a governmental entity. 28 U.S.C. § 1915A(a); *James v. Pa. Dep't of Corr.*, 230 Fed. App'x 195, 197 (3d Cir. 2007). The Court must dismiss the complaint if it "fails to state a claim upon which relief may be granted." 28 U.S.C. § 1915A(b)(1). The Court has a similar obligation with respect to actions brought *in forma pauperis* and actions concerning prison conditions. *See* 28 U.S.C. § 1915(e)(2)(B)(ii); 42 U.S.C. § 1997e(c)(1). *See generally Banks v. County of Allegheny*, 568 F. Supp. 2d 579, 587–89 (W.D. Pa. 2008) (summarizing prisoner litigation screening procedures and standards). "The court's obligation to dismiss a complaint under [these] screening provisions is not excused even after defendants have filed a  motion to dismiss." *Id.* at 589. In performing this mandatory screening function, a district court applies the same standard applied to motions to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Mitchell v. Dodrill*, 696 F. Supp. 2d 454, 471 (M.D. Pa. 2010); *Banks*, 568 F. Supp. 2d at 588.

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a defendant to move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "Under Rule 12(b)(6), a motion to dismiss may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds the plaintiff's claims lack facial plausibility." *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)). Although the Court must accept the fact allegations in the complaint as true, it is not compelled to accept "unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (quoting *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007)). In deciding the motion, the Court may consider the facts alleged on the face of the complaint, as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

## IV.   DISCUSSION

The defendants have moved for summary judgment on Real's

retaliation, access-to-courts, and due process claims. The plaintiff has moved for summary judgment on his retaliation and access-to-courts claims against CO Huber, and his retaliation claim against CO King. In addition, it is recommended that several claims—for which the parties have not moved for summary judgment—be dismissed *sua sponte*.

### A. Defendants' Motion for Summary Judgment

#### 1. *Retaliation Claim – Fabricated Misconduct Report*

Real claims that CO King issued a fabricated misconduct for possession of a steel shank in retaliation for his filing of several grievances concerning substandard living conditions in the SMU and denial of medical treatment. He claims that CO King did so at the direction of Lieutenant Gardner, Sergeant Boring, and Sergeant Cook. The defendants argue that that Real has failed to demonstrate a causal link between the filing of his grievances and the issuance of this misconduct.

In support of their motion for summary judgment, and in opposition to the plaintiff's summary judgment motion, the defendants have submitted declarations pursuant to 28 U.S.C. § 1746 by CO King, Lieutenant Gardner, Sergeant Boring, and Sergeant Cook, together with copies of the misconduct report issued by CO King and the disciplinary

hearing report in which Real was found guilty of possession of contraband and failure to report contraband. (Doc. 70, at 4–17). In his declaration, CO King stated that:

> 4. On January 16, 2012, I was conducting security cell inspections in the SMU. The practice was to start security cell inspections during showers. I entered cell No. A2-30 which was occupied by inmate Fernando Real, GG-0219. In a box in his cell, I saw a steel shank, about 5 to 8 inches in length. The shank was sharpened to a point on one end and wrapped in a sheet on the other end. I informed Sgt. Boring and Lt. Gardner, who were on duty at the time. They entered the cell to see the shank. Lt. Gardner took the shank from me.
>
> 5. I subsequently issued Misconduct No. B280925 to inmate Real, charging him with possession of a dangerous weapon, possession of contraband, and failure to report contraband. . . .
>
> 6. I did not issue the Misconduct to inmate Real in retaliation for any prior grievance or compliants which he had submitted or made. In fact, I was unaware of his prior grievances. . . . Contrary to Real's assertions, the shank in the inmate's property was not planted by me or any other SMU staff.

(*Id*. at 14–15). CO King's declaration is corroborated by the misconduct report itself (*id*. at 16), by the disciplinary hearing examiner's findings of fact and verdict that Real committed the charged offenses (*id*. at 17), and by Lieutenant Gardner's and Sergeant Boring's declarations.

In his declaration, Lieutenant Gardner stated that:

5. On January 16, 2012, inmate Real was removed from his cell for a shower and placed in the shower. Officer King then conducted a security cell inspection of Real's cell, during which he observed a shank sharpened to a point laying in the inmate's property box. King notified me of the weapon and I contacted the shift commander of the find. I also requested permission to conduct an investigative cell search.

6. I found a spot on the cell floor under the bed where inmate Real had sharpened the weapon. Also present at the time was Sergeant Boring.

7. Officer King issued Real a misconduct for possession of a weapon and other charges. The shank was bagged and sent to the Security Office. The misconduct was not issued for retaliatory reason. It was issued due to the infraction committed by inmate Real. It was not issued because of the inmate's prior complaints or grievances. The weapon was not planted by staff.

(*Id.* at 5). Lieutenant Gardner's declaration is corroborated by the misconduct report itself, by the disciplinary hearing examiner's findings of fact and verdict that Real committed the charged offenses, and by Sergeant Boring's and CO King's declarations.

In her declaration, Sergeant Boring stated that:

3. On January 16, 2012, it was my third day working in the SMU. I was in the process of escorting inmates to the showers. CO King was conducting security cell inspections on the top tier of the housing unit. CO King informed Lieutenant Gardner and myself that he had found a shank in the cell of inmate Fernando Real, GG-0219. I took possession of the shank and put it in the SMU control bubble. That was the extent of my

involvement with the shank.

> 4. I understand that CO King issued a misconduct to inmate Real for possession of contraband and other charges. . . .

> 5. Because this was only my third day in the SMU, I was unaware of any prior grievances or complaints by inmate Real. I did not plant the shank in inmate Real's cell . . . . I did not hear staff in the SMU threaten inmate Real with retaliation for filing grievances.

(*Id.* at 9). Sergeant Boring's declaration is corroborated by the misconduct report itself, by the disciplinary hearing examiner's findings of fact and verdict that Real committed the charged offenses, and by Lieutenant Gardner's and CO King's declarations.

In opposition to the defendants' motion for summary judgment, and in support of his own summary judgment motion, Real has filed a declaration pursuant to 28 U.S.C. § 1746 in which he stated that:

> 34. On January 16, 2012, I was incarcerated . . . at [SCI] Camp Hill in the [SMU] on E-block, cell 30, and at breakfast meal[] Defendant King told me he was going to carry out Defendants Cook and Stum's threat to falsify a misconduct against me in retaliation for me filing grievances.

> 35. On January 16, 2012, after the breakfast meal[], I went to the shower, [and] Defendant King conducted a security cell inspection while I was not present.

> 36. I was the only inmate housed in 30 cell on E-block on January 16, 2012, at Camp Hill and there was no steel

"shank" in that cell.

37. While conducting the security cell inspection of my cell, Defendant King admits he "pulled my property box from under my bed" and "opened it" and found a steel shank.

38. . . . DC-ADM 203[] is a written policy of the rules for security cell inspections.

39. DC-ADM 203 . . . states, "Inmates personal property shall not be searched or disturbed during a security cell inspection except to the extent necessary to gain access to the structural components of the cell."

40. DC-ADM 203 . . . states, "A DC-154A[] Confiscated Item Receipt (Inmate) will only be used to record all confiscated non-state issued items and for those which are the subject of a misconduct."

41. Defendant King alleges he found a steel "shank" in my cell and issued me a misconduct for the steel "shank", yet he did not use a DC154[A] (Confiscated Item Receipt) to record the steel "shank".

. . . .

44. To this day I have never seen the steel "shank" Defendant King alleges he found.

(Doc. 63, at 58–59 (citations and brackets omitted)). Real's declaration references various prison policy documents and the misconduct report itself, but he has identified no evidence in the record beyond his own self-serving testimony to corroborate his claims that: (1) CO King explicitly advised Real on the morning of January 16, 2012, that King planned to

fabricate a misconduct against Real in retaliation for the grievances filed by Real more than two months earlier; and (2) there was no steel shank in his cell, despite the other testimonial and documentary evidence of record.

To prevail on a retaliation claim, a prisoner must establish the following elements: (1) constitutionally protected conduct; (2) an adverse action by prison officials that is sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) a causal link between the exercise of his constitutional rights and the adverse action taken against him. *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003) (internal quotation marks and brackets omitted). The defendants here do not dispute that "[t]he filing of grievances is protected under the First Amendment." *Kelly v. York County Prison*, 340 Fed. App'x 59, 61 (3d Cir. 2009) (per curiam). Nor do they dispute that the issuance of a purportedly false misconduct report is an adverse action "sufficient to deter a person of ordinary firmness from exercising his constitutional rights." *Mitchell*, 318 F.3d at 530.

To evaluate the existence of a causal link, the Third Circuit has adopted a burden-shifting analysis: the prisoner-plaintiff bears the initial burden of proving that his constitutionally protected conduct was a

CRITICAL

substantial or motivating factor in the decision to take adverse action against him; and once a prisoner has made his *prima facie* case, the burden shifts to the defendant to prove by a preponderance of the evidence that he would have taken the same adverse action even in the absence of the protected activity, for reasons reasonably related to penological interest. *Carter v. McGrady*, 292 F.3d 152, 157–58 (3d Cir. 2002); *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001).

> In addition, in establishing the elements of a First Amendment claim of retaliation, a plaintiff must come forward with more than "general attacks" upon the defendant's motivations and must produce "affirmative evidence" of retaliation from which a jury could find that the plaintiff had carried his burden of proving the requisite motive.

*Fisher v. Matthews*, 792 F. Supp. 2d 745, 772 (M.D. Pa. 2011) (quoting *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998)). "Because retaliation claims can be easily fabricated, district courts must view prisoners' retaliation claims with sufficient skepticism to avoid becoming entangled in every disciplinary action taken against a prisoner." *Miskovitch v. Hostoffer*, 721 F. Supp. 2d 389, 396 (W.D. Pa. 2010).

Based on the evidence of record, viewed in the light most favorable to the plaintiff, no reasonable jury could conclude that he has adduced

sufficient evidence to demonstrate that his several grievances complaining of substandard living conditions in the SMU were a substantial or motivating factor in the decision to issue a misconduct for possession of contraband on January 16, 2012, more than two months after he filed those grievances. The evidence of record does not demonstrate an "unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action," or "a pattern of antagonism coupled with timing to establish a causal link." *See Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007); *see also DeFranco v. Wolfe*, 387 Fed. App'x 147, 155 (3d Cir. 2010) (two months temporal proximity insufficient). The only evidence submitted in support of Real's contention that the misconduct was issued in retaliation for his earlier grievances is Real's own uncorroborated testimonial statement that CO King explicitly warned Real earlier that day that he would do so, that CO King explicitly advised Real that he was doing so in retaliation for the earlier grievances, and that—based on Real's own personal knowledge—there simply was no steel shank in his cell. Such self-serving testimony cannot be used to obtain or avoid summary judgment when uncorroborated and contradicted by other evidence of record. *See Thomas v. Delaware State Univ.*, __ Fed.

App'x \_\_\_, 2015 WL 5520108, at \*4 n.6 (3d Cir. Sept. 21, 2015) ("[U]nsupported deposition testimony, which is contradicted by the record, is insufficient to defeat summary judgment."); *Nat'l Labor Rel. Bd. v. FES*, 301 F.3d 83, 95 (3d Cir. 2002) ("[The plaintiff's] testimony . . . amounts to an unsupported, conclusory assertion, which we have held is inadequate to satisfy the movant's burden of proof on summary judgment."); *Brooks v. Am. Broad. Cos., Inc.*, 999 F.2d 167, 172 (6th Cir. 1993) ("[T]he district court [is] not required to accept unsupported, self-serving testimony as evidence sufficient to create a jury question."); *cf. Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

Moreover, even assuming *arguendo* that Real satisfied his *prima facie* burden of demonstrating retaliatory animus by these defendants, Real's offense—possession of a steel shank—is so "clear and overt" a threat to security that there is no genuine dispute of material fact that issuance of a misconduct was "reasonably related to legitimate penological interests," and that Real would have been disciplined notwithstanding the several cell-condition grievances he filed months earlier. *See Carter*, 292

F.3d at 159. In addition to the testimonial declarations of defendants King, Gardner, and Boring—each of whom has stated unequivocally that he or she observed or handled the steel shank found in Real's cell—the misconduct report itself is sufficiently specific and adequate to support the charges lodged against Real. *See Nieves v. Dragovich*, No. CIV.A. 96-6525, 1997 WL 698490, at *4 (E.D. Pa. Nov. 3, 1997), *aff'd mem.*, 175 F.3d 1011 (3d Cir. 1999); *see also White v. Kane*, 860 F. Supp. 1075, 1079 & n.5 (E.D. Pa. 1994) (inmate constructively possessed contraband found in his cell), *aff'd*, 52 F.3d 319 (3d Cir. 1995); *Gebbia v. Holt*, Civil No. 4:06-CV-2171, 2007 WL 1893721, at *3 (M.D. Pa. July 2, 2007) (inmate constructively possessed shank found in his cell). The issuance of the misconduct report was endorsed by two supervising officers who are not defendants to this claim,[8] and it was reviewed and approved by the ranking corrections

---

[8] The misconduct report was reviewed by Lieutenant Rhoades, who recommended that Real "[r]emain [at] present status, phase 3, until seen by the hearing examiner," and that the "[m]isconduct [was] warranted." (Doc. 63-1, at 31; Doc. 69, at 95; Doc. 70, at 16). Lieutenant Rhoades was previously named as a defendant, but all claims against him were dismissed for failure to state a claim. (*See* Doc. 35; *see also* Doc. 32, at 7–9). The misconduct report was also reviewed by an officer whose initials appear to be "JRC," who likewise found that the "[m]isconduct [was] warranted due to the serious nature of the incident." (Doc. 63-1, at 31; Doc. 69, at 95; Doc. 70, at 16). No one with these initials has been named as a

*(continued on next page)*

officer on duty, Captain Eichenberg, that same day.[9] (Doc. 63-1, at 31; Doc. 69, at 95; Doc. 70, at 16).

A disciplinary hearing was held on January 19, 2012, at which hearing examiner Kristen Reisinger weighed the evidence, finding CO King's report more credible than Real's account, and found Real guilty of possession of contraband and failure to report contraband.[10] (Doc. 63-1, at 42; Doc. 69, at 97; Doc. 70, at 17). *See Nieves*, 1997 WL 698490, at *4 ("It is the hearing examiner's province, and not this court's, to gauge the credibility of evidence and witnesses at a misconduct hearing."); *White*, 860 F. Supp. at 1079 ("[I]t is the province of the disciplinary board or hearing officer to gauge the credibility of witnesses, not mine."). This disciplinary decision was reviewed and upheld on administrative appeal on February 10, 2012, by a program review committee ("PRC") whose three members

---

party to this action.

[9] Captain Eichenburg was previously named as a defendant, but all claims against him were dismissed for failure to state a claim. (*See* Doc. 35; *see also* Doc. 32, at 7–9). Captain Eichenburg was mistakenly identified by the misnomer "Captain Euhanburaz" in the complaint. (*See* Doc. 32, at 7 n.6).

[10] Examiner Reisinger was previously named as a defendant, but all claims against her were dismissed for failure to state a claim. (*See* Doc. 35, *see also* Doc. 32, at 11–16).

are not defendants in this case.[11] (Doc. 63-1, at 44). *See Pressley v. Johnson*, Civil Action No. 01-2350, 2007 WL 2907271, at *6 (W.D. Pa. Sept. 28, 2007) (finding of guilt for possession of contraband upheld by non-defendant PRC was sufficient evidence to conclude on summary judgment that the misconduct would have issued notwithstanding constitutionally protected activity), *aff'd per curiam*, 268 Fed. App'x 181 (3d Cir. 2008). The misconduct appeal was reviewed by the superintendent and referred back for further review by the PRC on March 19, 2012.[12] (Doc. 63-1, at 45). The hearing examiner's findings were reviewed and upheld a second time on administrative appeal by a PRC whose members are not defendants in this case.[13] (*Id.* at 46). *See Pressley*, 2007 WL 2907271, at *6. The misconduct decision was reviewed a second time and sustained by the

---

[11] The first PRC included: Scott Moore, Corrections Classification and Program Manager; Timothy Henry, Deputy Superintendent of the Diagnostic Center; and Kathleen Squierzyna, Deupy Superintendent of Centralized Services. (Doc. 63-1, at 44).

[12] Superintendent Robert Southers was previously named as a defendant, but all claims against him were dismissed for failure to state a claim. (*See* Doc. 35, *see also* Doc. 32, at 7–11).

[13] The second PRC included: Moore, Swierzyna, and James Meintel, Deputy Superintendent of Facility Management. (Doc. 63-1, at 46). On second review, the hearing examiner's findings and verdict were upheld, but the sanction imposed was reduced to sixty days of disciplinary custody. (*Id.*).

superintendent on May 24, 2012. (Doc. 63-1, at 47). On June 27, 2012, it was reviewed and upheld on final review by Chief Hearing Officer Robin M. Lewis, who is not a defendant in this case. (*Id.* at 48). *See Pressley*, 2007 WL 2907271, at *6. Lewis explicitly found that "the findings made by the Examiner are amply supported by evidence presented at your hearing." (Doc. 63-1, at 48).

This Court is mindful of the Supreme Court's admonition that "[p]rison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). Based on the evidence of record, viewed in the light most favorable to the plaintiff, no reasonable jury could conclude that the decision to discipline Real was not within the broad discretion of prison officials to assure prison safety and promote compliance with prison rules, or that Real would not have been disciplined but for the cell-condition grievances he filed two months earlier. *See Pressley*, 2007 WL 2907271, at *6.

Accordingly, it is recommended that the defendants' motion for summary judgment (Doc. 66) be granted and judgment be entered in their

favor with respect to Real's First Amendment retaliation claim against CO King, Lieutenant Gardner, and Sergeant Boring.

## 2. *Retaliation Claim – Destruction of Personal Property*

Real claims that CO Huber destroyed two magazines in retaliation for his filing of a grievance concerning the seizure of his property, and that CO Huber subsequently destroyed certain legal papers in retaliation for his filing of a grievance concerning destruction of the two magazines. The defendants argue that the destruction of the two magazines and perishable food items do not constitute an adverse action for the purpose of a retaliation claim, and that all non-contraband property was stored rather than destroyed (i.e., CO Huber did not destroy any of Real's legal papers).

In support of their motion for summary judgment, and in opposition to the plaintiff's summary judgment motion, the defendants have submitted a declaration pursuant to 28 U.S.C. § 1746 by CO Huber, together with copies of a confiscated items receipt and an inmate personal property inventory form. (Doc. 70, at 18–23). In his declaration, CO Huber stated that:

> 3. Each inmate in the SMU is permitted to retain only one box of written material in his cell, regardless of SMU programming phase. SMU inmates may retain as many books and other written material that will fit into the

box, provided that the material is appropriate for the inmate's SMU programming phase and is not contraband. Written legal material is considered "written material" and is required to fit within the box, along with all other written material. . . .

4. If an inmate accumulates more written material than will fit into the permitted single box of written material, the excess material will be removed from the inmate's cell. Any material that is not otherwise considered contraband will be placed in the inmate's stored property in the SMU property room.

5. I am familiar with inmate Fernando Real, GG-0219, who was formerly housed in the SMU. On January 16, 2012, a shank was found in Real's cell and he was issued a misconduct. He was also demoted to Phase 5 DC status. As a result of his misconduct and demotion, the inmate's in-cell property [was searched] and inventoried. I completed an inventory of Real's cell property on January 30, 2012, accompanied by another Officer.

6. Phase 5 DC inmates are not permitted to order or retain commissary food items. Therefore, I confiscated the food items in the inmate's cell. I also confiscated contraband items such as two magazines, photos and a nude picture. SMU inmates are only permitted a maximum of 10 photos in their cell at any one time. Inmate Real had a total of 41 photos in his cell. Therefore, 31 photos were confiscated and returned to his storage. I issued to Real Confiscated Items Receipt No. B367334. An Inmate Personal Property Inventory form was also prepared. . . .

7. Inmate Real had over two boxes of property in his cell. He did not have a legal exemption to have an extra box in his cell. One full box of written material was returned to the inmate. On February 2, 2012, I completed a written property exchange at inmate Real's cell door. At

that time, inmate Real exchanged six inches of written material and I issued him one book. The confiscated property which was contraband (such as food) was destroyed, while the other confiscated property was put in storage. Real's property was not destroyed for any retaliatory reason.

. . . .

9. I did not confiscate Real's property in retaliation for any prior grievances or complaints which he had submitted. At all times I acted in accordance with Department[] rules and regulations. I also deny making threatening statements to inmate Real, such as he claims I did.

(*Id.* at 18–20). CO Huber's declaration is corroborated by the confiscated

items receipt (*id.* at 22) and the inmate personal property inventory form

(*id.* at 23).

In opposition to the defendants' motion for summary judgment, and

in support of his own summary judgment motion, Real has filed a

declaration pursuant to 28 U.S.C. § 1746 in which he stated that:

11. In December 2011, while I was in the [SMU] at [SCI] Camp Hill, I received an affidavit from "Lisa" and she avers she witnessed Terrell Boyd shoot Marcus Herbert and Byron Story on September 9, 2002. Along with her Affidavit Lisa sent me her full name, date of birth and address.

12. On January 16, 2012, correctional staff at [SCI] Camp Hill took all the property I had in my cell—including Lisa's affidavit, and the only record I possessed of her full name, address and date of birth.

13. On January 19, 2012, I asked Defendant Huber where is my property that correctional staff took out of my cell. Defendant Huber told me he had my property. I told him that I had legal deadlines approaching and I needed my legal material that he has. I told Defendant Huber that if my property is not returned to me that my access to the courts will be violated. To which Defendant Huber replied, "If you put a grievance in on me talking that shit I promise you I'll throw your property in the fuckin trash."

14. On January 23, 2012, I filed grievance number 397924 wherein I quote Defendant Huber's threat to destroy my property if I filed this grievance alleging he is violating my access to courts. I requested that my property be returned to me and that none of my property be destroyed.

15. On January 31, 2012, Defendant Huber gave me Confiscated Item Receipt number B 367334 wherein Defendant Huber admits he destroyed two of my magazines. I told Defendant Huber that I would file a grievance about him destroying my two magazines, I asked why he destroyed them? Defendant Huber said he will talk to me about it tomorrow. . . .

16. On February 2, 2012, I again asked Defendant Huber why he destroyed my magazines and where is my legal material? Defendant Huber told me that he destroyed my magazines because I filed grievance number 397924 and he told me he'll destroy my property if I filed that grievance on him and said he destroyed my missing legal material because I said I would file a grievance about him destroying my magazines.

17. I asked Defendant Huber to give me a Confiscated Item Receipt for the missing legal material he destroyed, and he said, "I made a mistake by giving you that confiscation slip for the magazines and food, I'm not

dumb enough to fuck up twice." . . .

. . . .

> 19. The missing legal material destroyed by Defendant
> Huber was Lisa's affidavit wherein she swears she saw
> Terrell Boyd shoot Marcus Herbert and Byron Story on
> September 9, 2002, also destroyed was the only record I
> had of Lisa's full name, address and date of birth.
> Without these documents I did not know—nor could I
> get—Lisa's full name, address or date of birth.

(*Id.* at 55–56). Real has identified no evidence in the record beyond his own

self-serving testimony to corroborate his claims that: (1) CO Huber

explicitly threatened to destroy Real's personal property if he filed a

grievance about its confiscation; (2) CO Huber explicitly advised Real that

he had destroyed Real's magazines and legal papers in retaliation for

Real's filing of grievances against CO Huber; and (3) the legal papers

purportedly destroyed by CO Huber included an exculpatory affidavit by

an eyewitness to a murder for which Real was awaiting trial.

As noted previously, to prevail on a retaliation claim, a prisoner must

establish: (1) constitutionally protected conduct; (2) an adverse action by

prison officials that is sufficient to deter a person of ordinary firmness

from exercising his constitutional rights; and (3) a causal link between the

exercise of his constitutional rights and the adverse action taken against

him. *Mitchell*, 318 F.3d at 530. Here, it is the second element that is

dispositive.

Based on the evidence of record, viewed in the light most favorable to the plaintiff, no reasonable jury could conclude that he has adduced sufficient evidence to demonstrate an adverse action by prison officials that is sufficient to deter a person of ordinary firmness from exercising his constitutional rights. For one, the confiscation and destruction of two tattered magazines is so *de minimis* or inconsequential that it is insufficient to support a retaliation claim as a matter of law, as this act could not conceivably deter a prisoner of ordinary firmness from exercising his First Amendment right to file prison grievances. *See Sanchez v. Calfee*, 558 Fed. App'x 428, 429 (5th Cir. 2014) (per curiam); *Shannon v. Venettozzi*, No. 13 Civ. 4530(KBF), 2015 WL 114179, at *6 (S.D.N.Y. Jan. 8, 2015), *appeal filed*, No. 15-2484 (2d Cir. Aug. 6, 2015); *see also Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000); *Hardwick v. Packer*, Civil Action No. 1:12-cv-1936, 2013 WL 4016495, at *18 (M.D. Pa. Aug. 6, 2013); *Wheeler v. Beard*, No. Civ.A.03-4826, 2005 WL 1840159, at *4 n.2 (E.D. Pa. Aug. 3, 2005). The only other evidence identified by the plaintiff to support his retaliation claim against CO Huber is his own uncorroborated testimonial statement that: (1) CO Huber explicitly threatened to destroy

Real's property if he filed a grievance; (2) that CO Huber explicitly admitted having destroyed the magazines and legal papers in retaliation for Real's filing of grievances; and (3) that the purportedly missing legal papers included a blockbuster affidavit from an eyewitness who observed someone else committing the murder for which Real was awaiting trial. Such self-serving testimony cannot be used to obtain or avoid summary judgment when uncorroborated and contradicted by other evidence of record. *See Thomas*, 2015 WL 5520108, at *4 n.6; *FES*, 301 F.3d at 95; *Brooks*, 999 F.2d at 172; *cf. Anderson*, 477 U.S. at 252.

In addition to his unequivocal testimonial declaration that he did not destroy any of Real's legal materials, CO Huber prepared contemporaneous records inventorying the confiscated property and documenting what was destroyed, stored, or returned to Real. (*See* Doc. 70, at 22–23). The record also includes multiple grievances Real filed complaining about lost or destroyed property, each of which was investigated and found to be without merit.

On January 19, 2012, Real filed Grievance No. 397924, complaining about the confiscation of his personal property. (Doc. 69, at 106). This grievance was investigated by John Horner, Major of Unit Management,

who denied it as having "no merit" and being "frivolous."[14] (*Id.* at 105). Real filed an administrative appeal, which was denied by the superintendent on March 1, 2012, as frivolous and meritless.[15] (*Id.* at 103). In particular, the superintendent found that:

> [T]he grievance officer properly investigated your claims and provided an appropriate response. . . . There is no evidence to suggest that any of your property was destroyed or inappropriately confiscated. You offer no additional evidence or information which would cause me to remand your grievance for further review. I uphold the Major's response as well as his determination of frivolous[ness].

(*Id.*). Real attempted to appeal to the state's chief grievance officer, but on May 1, 2012, his appeal was denied as untimely submitted. (*Id.* at 99).

On February 1, 2012, Real filed Grievance No. 399962, complaining about CO Huber's destruction of contraband confiscated from his cell on January 16, 2012, including two magazines, various food items, and a nude photo. (Doc. 63-1, at 13; Doc. 70, at 31). This grievance was investigated by Unit Manager Chambers, who denied it on its merits. (Doc.

---

[14] Major Horner was previously named as a defendant, but all claims against him were dismissed for failure to state a claim. (*See* Doc. 35; *see also* Doc. 32, at 7–9).

[15] As noted earlier, Superintendent Southers was previously named as a defendant, but all claims against him were dismissed for failure to state a claim. *See supra* note 12.

63-1, at 27; Doc. 70, at 33). Real filed an administrative appeal, which was denied by the superintendent on its merits on March 19, 2012. (Doc. 63-1, at 29). In particular, the superintendent found that "the grievance officer properly investigated your claims and provided an appropriate response." (*Id.*). Real appealed to the state's chief grievance officer, Dorina Varner, who denied his final appeal on its merits on May 7, 2012.[16] (*Id.* at 30). In particular, she found that:

> An investigation into the matter reveals that all of your property was inventoried and either confiscated or destroyed in accordance with the SMU policy and procedure. As you are classified as a phase 5 SMU inmate, you are not permitted to retain food commissary items and they cannot be stored in your property due to the fact that the food could spoil or cause a pest and rodent problem. The two magazines were determined to be contraband due to the fact that they were in pieces and not permitted. There are conditions of each phase of the SMU program and there are limits to the amount of items allowed in your cell. You are only permitted to have ten photographs in your cell while in Phase 5. You did not state in the initial grievance or appeal to the Superintendent that you had a court deadline to meet, and if you do, you must provide the docket number to be verified and the staff will work with you in accordance with the RHU and SMU procedures. There is no evidence to substantiate your claim that staff is retaliating against

---

[16] Chief Grievance Officer Varner was previously named as a defendant, but all claims against him were dismissed for failure to state a claim. (*See* Doc. 35; *see also* Doc. 32, at 7–11).

you because your description of what occurred regarding
your property is in accordance with the policy.

(*Id.*).

Real filed two additional grievances, Grievance No. 399754 and
Grievance No. 402478, about his property and retaliation claims. (Doc. 70,
at 29, 34). Both were investigated by Unit Manager Chambers and denied
on their merits. (*Id.* at 30, 35). Neither grievance response appears to have
been appealed.

Notably, neither the confiscated items receipt nor the inmate
property inventory form, which together appear to comprehensively
document the disposition of Real's property, indicates the destruction of
any written material beyond the two magazines. (*See* Doc. 70, at 22–23).
The loss or destruction of the "Lisa" affidavit is not mentioned in any of
the papers submitted by Real in his various grievance proceedings. (*See*
Doc. 63-1, at 13, 28; Doc. 69, at 100, 102, 104, 106; Doc. 70, at 29, 31–32,
34). Other than generalized allegations of lost or destroyed legal materials,
the first mention of this affidavit by Real appears to be at his November
2014 deposition. (*See* Doc. 69, at 54).[17]

---

[17] It is also noteworthy that Real previously presented this Court
*(continued on next page)*

Based on the evidence of record, viewed in the light most favorable to the plaintiff, no reasonable jury could conclude that Real has adduced sufficient evidence to demonstrate an adverse action by prison officials that is sufficient to deter a person of ordinary firmness from exercising his constitutional rights. Accordingly, it is recommended that the defendants' motion for summary judgment (Doc. 66) be granted and judgment be entered in their favor with respect to Real's First Amendment retaliation claim against CO Huber.

### 3. *Access-to-Courts Claims*

Real claims that the destruction of the purportedly exculpatory "Lisa" affidavit by CO Huber violated his constitutional right to access the courts insofar as he was consequently unable to locate Lisa and subpoena her to testify on his behalf at his February 2014 trial for the murders of Marcus Herbert and Byron Story. He further claims that the misconduct issued by CO King resulted in a restriction from using the "mini law

---

with a substantially identical claim in an earlier civil suit, claiming in that case that prison officials destroyed or lost an affidavit from a witness who received a dying declaration from Levon Wilson that identified someone other than Real as his murderer. *See Real v. Dunkle*, Civil Action No. 3:11-CV-2071, 2014 WL 7335039, at *5, *12 (M.D. Dec. 19, 2014), *appeal filed*, No. 15-1018 (3d Cir. Jan. 5, 2015).

library" while in disciplinary custody, and, as a consequence, he was unable to adequately research legal arguments in support of a *pro se* motion for return of seized property pending in state court. The defendants argue that Real is unable to establish an unconstitutional denial of access to the courts because he was represented by counsel at his February 2014 criminal trial, and because his constitutional right to access the courts did not require unfettered access to the "mini law library" in connection with *pro se* civil proceedings to recover property seized upon his arrest. They also contest whether the affidavit ever existed in the first place.

It is well-established that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith*, 430 U.S. 817, 828 (1977). "A prisoner raising an access-to-courts claim must show that the denial of access caused him to suffer an actual injury." *Garcia v. Dechan*, 384 Fed. App'x 94, 95 (3d Cir. 2010) (per curiam); *see also Lewis v. Casey*, 518 U.S. 343, 351 (1996). "An actual injury occurs when the prisoner is prevented from or has lost the opportunity to pursue a 'nonfrivolous' and 'arguable' claim." *Garcia*, 384

Fed. App'x at 95; *see also Christopher v. Harbury*, 536 U.S. 403, 415 (2002).

Moreover, under *Bounds*, the "injury requirement is not satisfied by just

any type of frustrated legal claim." *Lewis*, 518 U.S. at 354.

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

*Id.* at 355.

It is undisputed that, at the time of the events underlying this claim,

Real was represented by court-appointed counsel in the criminal

proceedings that later culminated in a February 2014 trial. Real claims to

have received the unsolicited "Lisa" affidavit in the mail in November

2011, and that it was destroyed by CO Huber in January or February

2012. It is undisputed that, during this two- to three-month period, Real

did not attempt to forward a copy of the affidavit to his criminal defense

counsel, James Lammendola. Only later, after the purported affidavit had

been destroyed and new defense counsel had been appointed to represent

Real in the criminal proceedings, did Real advise his new defense counsel,

Gerald Stein, of the affidavit. Stein was unable to locate "Lisa" and present her as a witness at trial; Real contends that the lost affidavit contained the additional information necessary to identify and locate her, and that her prospective testimony, as summarized in the lost affidavit, would have exonerated him of the murders of Marcus Herbert and Byron Story.

The undisputed fact that Real was represented by counsel in his criminal proceedings forecloses Real's access-to-courts claim as a matter of law. *See Pressley v. Johnson*, 268 Fed. App'x 181, 183 (3d Cir. 2008) (per curiam) (alleged destruction of prisoner's legal materials did not deny access to courts where he was represented by counsel and received a jury trial on his civil rights claims); *Walters v. Edgar*, 973 F. Supp. 793, 799 (N.D. Ill. 1997) ("The fact that counsel represented him on appeal [from a criminal conviction and sentence] . . . satisfies the requirements of *Bounds v. Smith*."); *Wilson v. Wittke*, 459 F. Supp. 1345, 1346 (E.D. Wis. 1978) ("[T]he plaintiff is represented by counsel and therefore has adequate access to the courts. . . . [T]he plaintiff's claim that he is being deprived of access to the courts is clearly foreclosed by *Bounds v. Smith*."); *Urbano v. McCorkle*, 164 (D.N.J. 1971) (finding no denial of access to the courts where prisoner was represented by counsel and was allowed reasonable

contact with counsel), *aff'd mem.*, 481 F.2d 1400 (3d Cir. 1973). There is no evidence that the defendants prevented Real from communicating with counsel or otherwise interfered with counsel's efforts in that case. *See Garcia*, 384 Fed. App'x at 95. The *Bounds* decision "guarantee[d] no particular methodology but rather the *conferral of a capability*—the capability of bringing contemplated challenges to sentences or conditions of confinement before the court." *Lewis*, 518 U.S. at 356 (emphasis added). Based on the undisputed facts, it is clear that it was Real's own, unilateral failure to communicate with his defense attorney, rather than the acts of any prison official, that prevented him from investigating and presenting the potentially exculpatory testimony of "Lisa" at his February 2014 trial.

Real attempts to excuse his own failure to communicate with defense counsel by asserting that he did not "trust" Attorney Lammendola. But the effectiveness of Real's defense counsel is irrelevant to his access-to-courts claim; in the absence of any interference with communication between attorney and client or the efforts of counsel to mount a defense, the appointment of licensed counsel to represent him satisfies the state's obligation to provide "adequate assistance from persons trained in the law." *Bourdon v. Loughren*, 386 F.3d 88, 90 (2d Cir. 2004); *see also Schrier*

*v. Halford*, 60 F.3d 1309, 1313–14 (8th Cir. 1995) ("[T]he term 'adequate' as used in *Bounds* to modify 'assistance from persons trained in the law,' refers not to the effectiveness of the representation, but to the adequacy of the prisoner's access to his or her court-approved counsel or other law-trained assistant.").

With respect to Real's motion for return of property, this proceeding was a challenge to neither his criminal conviction and sentence nor his conditions of confinement. *See Lewis*, 518 U.S. at 355; *see also Boniella v. Commonwealth*, 958 A.2d 1069, 1072–73 (Pa. Commw. Ct. 2008) ("[A]lthough a proceeding seeking the return of property in quasi-criminal in character, it is civil in form. As a result, many rights that would normally be afforded to a criminal defendant in a criminal matter do not apply to motions for the return of property.") (citation, internal quotation marks, and ellipses omitted); *cf. Wilson v. Blankenship*, 163 F.3d 1284, 1291 (11th Cir. 1998) ("[A] forfeiture case is not a type of case that is included under the right of inmates' access to courts under *Lewis*, which limits that right to direct or collateral appeals and civil rights cases."). As such, any impairment to Real's "litigating capacity" in seeking the return of his seized property "is simply one of the incidental (and perfectly

constitutional) consequences of conviction and incarceration." *Lewis*, 518 U.S. at 535.

Accordingly, it is recommended that the defendants' motion for summary judgment (Doc. 66) be granted and judgment be entered in their favor with respect to Real's access-to-courts claims.

### 4. *Lost or Destroyed Property Due Process Claim*

In his complaint, Real alleged, in cursory fashion, that the confiscation and destruction of his personal property on January 16, 2012, violated his state constitutional right to acquire, possess, and protect property, which the Court and the defendants have liberally construed as a claim that the defendants unlawfully seized and destroyed his personal property in violation of his Fourteenth Amendment due process rights.[18] The defendants argue that they are entitled to summary judgment on this claim because Real was afforded an adequate post-deprivation remedy. Real failed to respond whatsoever to the defendants' arguments on this point.

In evaluating a motion for summary judgment, the Court must first

---

[18] There is no private cause of action for damages under the Pennsylvania Constitution. *See Pocono Mountain Charter Sch. v. Pocono Mountain Sch. Dist.*, 442 Fed. App'x 681, 687 (3d Cir. 2011).

determine if the moving party has made a *prima facie* showing that it is entitled to summary judgment. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Once that *prima facie* showing has been made, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331.

Here, the defendants have met their initial burden on summary judgment of showing that they are entitled to summary judgment. "[W]here the State must take quick action, or where it is impractical to provide meaningful predeprivation process, due process will be satisfied by a meaningful postdeprivation remedy." *Tillman v. Lebanon County Corr. Facility*, 221 F.3d 410, 421 (3d Cir. 2000). "[U]nder circumstances such as these, a random search for contraband, courts have found that prisoners' entitlement to due process is circumscribed by safety and security interests. . . . [A]n unauthorized and random taking of property from inmates by prison officials does not violate the Fourteenth Amendment if a meaningful post-deprivation remedy is available." *Robinson v. Ridge*, 996 F. Supp. 447, 450 n.4 (E.D. Pa. 1997), *aff'd mem.*, 175 F.3d 1011 (3d Cir. 1999). Courts have found that the inmate grievance procedures available to Pennsylvania state inmates constitute adequate postdeprivation

remedies for the loss, theft, or destruction of an inmate's personal property by prison officials. *See Bey v. Keen*, Civil No. 1:CV-12-00732, 2012 WL 5051924, at *7 (Oct. 18, 2012) (collecting cases), *appeal dismissed*, No. 12-4073 (3d Cir. dismissed Nov. 26, 2013); *Robinson*, 996 F. Supp. at 450 n.4. In this case, Real filed and received responses to multiple grievances regarding the loss or destruction of his property. (*See* Doc. 70, 25–35; *see also* Doc. 69, at 99–106).

The defendants having made a *prima facie* showing that they are entitled to summary judgment, Real bears the burden of demonstrating the existence of a genuine dispute of material fact. He has failed to do so. In his opposition papers, Real has failed to set forth any facts or evidence to demonstrate any dispute whatsoever on this issue. His briefs do not even acknowledge the assertion of a Fourteenth Amendment due process claim based on the confiscation and destruction of his personal property.

Accordingly, it is recommended that the defendants' motion for summary judgment (Doc. 66) be granted and judgment be entered in their favor with respect to Real's Fourteenth Amendment due process claim based on the confiscation and destruction of his personal property on January 16, 2012.

## B. Plaintiff's Motion for Partial Summary Judgment

Real has likewise moved for summary judgment with respect to his retaliation and access-to-courts claims against CO Huber and his retaliation claim against CO King. Based on the foregoing discussion, and viewing the record in the light most favorable to the defendants as non-moving parties, we find that Real has failed to establish his entitlement to summary judgment on these claims. Accordingly, it is recommended that Real's motion for partial summary judgment (Doc. 61) be denied.

## C. *Sua Sponte* Dismissal of Claims

Several other claims remain for which the parties have not explicitly moved for summary judgment.[19] It is recommended that each be dismissed *sua sponte* for failure to state a claim.

### 1. *Cell Conditions Claim Against Defendant Bear*

The only allegations against CTI Bear in the complaint, including the supplemental complaint, concern his role in the plaintiff's substandard living conditions claim, which was previously dismissed. There are no facts alleged, nor any evidence adduced, that connect CTI Bear to Real's

---

[19] Although the defendants have submitted declarations by Sergeant Cook and CO Stum, their motion papers do not explicitly advance grounds for summary judgment with respect to these two defendants.

surviving federal civil rights claims.[20] Accordingly, it is recommended that all claims be dismissed as against CTI Bear for failure to state a claim, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), 28 U.S.C. § 1915A(b)(1), and 42 U.S.C. § 1997e(c)(1).

## 2. *Retaliation Claim Against Defendant Stum*

The complaint alleges that, throughout the month of October 2011, Real filed several sick call slips for headaches, nausea, and other symptoms allegedly caused by substandard living conditions,[21] but medical personnel did not respond. Real then filed a grievance complaining that he had been denied medical treatment, but his grievance was denied. Real then asked CO Stum on November 14, 2011, to contact medical staff to examine him. The complaint alleges that, in response, CO Stum "conceded" that he was aware of Real's "medical conditions," but denied Real's request to contact medical staff. (Doc. 1, at 9). The complaint further

---

[20] As noted by the defendants in a footnote to their primary summary judgment brief, Real admitted as much in his deposition. (Doc. 68, at 10 n.1; Doc. 69, at 68). Real does not reference CTI Bear at all in his briefs, implicitly conceding that no surviving claim remains against CTI Bear. (*See, e.g.*, Doc. 75, at 1 ("There are seven remaining Defendants – Huber, Gardner, Boring, Cook, King, Stum, Chambers and Carberry.").

[21] Specifically, Real alleged that plumbing problems in the SMU had contaminated the in-cell drinking water and caused a noxious odor, which in turn caused him to suffer a variety of medical maladies.

alleges in the very next paragraph, that Real was able to speak with a nurse that same day, whom he informed of his medical conditions. (*Id.*).

Because the complaint fails to allege an "adverse action" at the hands of CO Stum, it is recommended that the First Amendment retaliation claim against CO Stum be dismissed for failure to state a claim, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), 28 U.S.C. § 1915A(b)(1), and 42 U.S.C. § 1997e(c)(1).

### 3. *Retaliation Claim Against Defendant Cook*

The complaint alleges that, on October 24, 2011, Sergeant Cook threatened to issue a misconduct to Real in order to stop him from using the mini law library and to ensure he failed the SMU program. (Doc. 1, at 10). Real contends that this threat was made in retaliation for his filing of a grievance complaining that the ventilation system in the SMU was not working. (*Id.* at 11). The complaint further alleges that Sergeant Cook was behind the allegedly fabricated misconduct issued by CO King on January 16, 2012, more than two months later. (*Id.*). No other interaction between Sergeant Cook and Real is alleged. The complaint has failed to allege any facts that plausibly demonstrate an "unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory

action," or "a pattern of antagonism coupled with timing to establish a causal link." *See DeFlaminis*, 480 F.3d at 267; *see also DeFranco*, 387 Fed. App'x at 155 (two months temporal proximity insufficient). Accordingly, it is recommended that the First Amendment retaliation claim against Sergeant Cook be dismissed for failure to state a claim, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), 28 U.S.C. § 1915A(b)(1), and 42 U.S.C. § 1997e(c)(1).

### 4. *Claims Against Defendants Carberry and Chambers*

The only factual allegations against Unit Managers Carberry and Chambers in the complaint, including the supplemental complaint, concern their role in the plaintiff's substandard living conditions claim, which was previously dismissed. Both are included among a list of particular defendants against whom Real intended to bring his First Amendment retaliation claims, but no facts whatsoever are alleged to indicate any personal involvement by these defendants in the alleged retaliation. "Civil rights claims cannot be premised on a theory of *respondeat superior*. Rather, each named defendant must be shown, via the complaint's allegations, to have been personally involved in the events or occurrences which underlie a claim." *Millbrook v. United States*, 8 F.

Supp. 3d 601, 613 (M.D. Pa. 2014) (citation omitted). As previously explained by the Third Circuit:

> A defendant in a civil rights action must have personal involvement in the alleged wrongs . . . . [P]ersonal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity.

*Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). In the absence of any allegations of personal involvement by these defendants in any of the alleged wrongdoing, Real has failed to state a claim against them under 42 U.S.C. § 1983. Accordingly, it is recommended that all claims be dismissed as against Unit Managers Carberry and Chambers for failure to state a claim, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), 28 U.S.C. § 1915A(b)(1), and 42 U.S.C. § 1997e(c)(1).

### 5. *Right-to-Present-Defense Claim*

It is recommended that the Court *sua sponte* dismiss Real's claim that the loss or destruction of his legal documents violated his Sixth Amendment right to present a defense at his February 2014 murder

trial.[22] Pursuant to the favorable termination rule articulated by the Supreme Court of the United States in *Heck v. Humphrey*, 51 U.S. 477 (1994), this claim is not cognizable under 42 U.S.C. § 1983.

In *Heck*, the Supreme Court held that, where judgment in favor of a plaintiff in a § 1983 action for damages would necessarily imply the invalidity of the plaintiff's criminal conviction or sentence, the plaintiff must first demonstrate "that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus [under] 28 U.S.C.

---

[22] "To establish a violation of the right to present a defense based on lost evidence, a defendant must show that the material was material and exculpatory, and that it was 'of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" *Buie v. Sullivan*, 923 F.2d 10, 11 (2d Cir. 1990) (quoting *California v. Trombetta*, 467 U.S. 479, 489 (1984)). Moreover, the defendant must show "bad faith on the part of the state." *Id.* at 11–12 (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)); *see also Trombetta*, 467 U.S. at 488. "Finally, the misconduct must demonstrate 'that the absence of [fundamental] fairness infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial." *Buie*, 923 F.2d at 12 (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 872 (1982)). Considering these elements of a Sixth Amendment right-to-present-defense claim, it is clear that judgment in favor of the plaintiff on this claim would necessarily imply the invalidity of his criminal conviction or sentence.

§ 2254." *Id.* at 486–87. In *Wilkinson v. Dotson*, 544 U.S. 74 (2005), the Supreme Court reaffirmed this rule and broadened it to encompass equitable remedies as well, holding that "a state prisoner's § 1983 action is barred (absent prior invalidation)—no matter what the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings)—*if* success in that action would necessarily demonstrate the invalidity of confinement or its duration." *Id.* at 81–82.

Real has failed to demonstrate that his conviction or sentence has been invalidated. Accordingly, under *Heck*, Real's Sixth Amendment right-to-present-defense claim is not cognizable under 42 U.S.C. § 1983. *See Edwards v. Balisok*, 520 U.S. 641, 644–48 (1997) (claim that hearing officer denied plaintiff his right to present evidence at prison disciplinary hearing was barred by *Heck*); *Szymanski v. Vafalino*, 215 F.3d 1337 (table decision), 2000 WL 633044, at *1 (10th Cir. 2000) (claim that defendants conspired to deprive plaintiff of right to present a defense during criminal proceedings was barred by *Heck*); *Widi v. McNeil*, No. 2:12-cv-00188-JAW, 2013 WL 5348628, at *17 (D. Me. Sept. 24, 2013) (claim that ATF agent deprived plaintiff of his right to present witnesses at his criminal trial was

barred by *Heck*).

Accordingly, it is recommended that Real's Sixth Amendment right-to-present-defense claim be dismissed for failure to state a claim pursuant to 28 U.S.C. 1915(e)(2)(B)(ii), 28 U.S.C. § 1915A(b)(1), and 42 U.S.C. § 1997e(c)(1).

### 6. *Violation of Prison Policies and Procedures*

In connection with his constitutional claims, the plaintiff has noted several instances in which various defendants failed to comply with Pennsylvania Department of Corrections policies.[23] To the extent that Real seeks relief for the violation of state prison regulations, *see generally Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244–46 (3d Cir. 2013) (discussing a court's obligation to liberally construe *pro se* pleadings and other submissions, particularly when dealing with imprisoned *pro se* litigants), these regulations do not constitute federal law, and therefore such claims are not cognizable under 42 U.S.C. § 1983. *See Faircloth v. Schwartz*, Civil Action No. 12-cv-02764-REB-KLM, 2014 WL 4466663, at *21 (D. Colo.

---

[23] For example, Real notes that CO King failed to provide him with a receipt to document the confiscation of the shank purportedly found in his cell, and that CO Huber purportedly destroyed the two magazines prior to resolution of prison grievance proceedings initiated by Real.

Sept. 10, 2014) ("[Because] administrative regulations cannot create private causes of action outside the scope of substantive rights . . . [an inmate] has no right to enforce prison regulations through a private legal action, except to the extent that those regulations implicated constitutional rights.") (citing *Alexander v. Sandoval*, 532 U.S. 275, 289–93 (2001)); *see also Bullard v. Scism*, 449 Fed. App'x 232, 235 (3d Cir. 2011) (per curiam) ("[E]ven if the [BOP's] regulation were violated, its violation is not actionable."). Accordingly, it is recommended that any claims with respect to the violation of state prison regulations be dismissed for failure to state a claim, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), 28 U.S.C. § 1915A(b)(1), and 42 U.S.C. § 1997e(c)(1).

## V.   RECOMMENDATION

For the foregoing reasons, it is hereby recommended that:

1.   The defendants' motion for summary judgment (Doc. 66) be **GRANTED**;

2.   The plaintiff's motion for partial summary judgment (Doc. 61) be **DENIED**;

3.   The Clerk be directed to enter **JUDGMENT** in favor of the defendants and against the plaintiff with respect to the plaintiff's

retaliation claims against defendants King, Gardner, Boring, and Huber, his access-to-courts claims, and his due process claim based on confiscation or destruction of his personal property;

4.    All remaining claims be **DISMISSED** for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), 28 U.S.C. § 1915A(b)(1), and 42 U.S.C. § 1997e(c)(1); and

5.    The Clerk be directed to mark this case as **CLOSED**.

Dated: November 17, 2015          ___*s/ Joseph F. Saporito, Jr.*___
                                                       **JOSEPH F. SAPORITO, JR.**
                                                       **United States Magistrate Judge**

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

FERNANDO REAL,

      Plaintiff,

      v.

C/O HUBER, et al.,

      Defendants.

CIVIL ACTION NO. 3:13-cv-01054

(BRANN, J.)
(SAPORITO, M.J.)

## NOTICE

NOTICE IS HEREBY GIVEN that the undersigned has entered the

foregoing Report and Recommendation dated November 17, 2015. Any

party may obtain a review of the Report and Recommendation pursuant to

Local Rule 72.3, which provides:

> Any party may object to a magistrate judge's proposed
> findings, recommendations or report addressing a motion
> or matter described in 28 U.S.C. § 636(b)(1)(B) or making
> a recommendation for the disposition of a prisoner case
> or a habeas corpus petition within fourteen (14) days
> after being served with a copy thereof. Such party shall
> file with the clerk of court, and serve on the magistrate
> judge and all parties, written objections which shall
> specifically identify the portions of the proposed findings,
> recommendations or report to which objection is made
> and the basis for such objections. The briefing
> requirements set forth in Local Rule 72.2 shall apply. A
> judge shall make a de novo determination of those
> portions of the report or specified proposed findings or
> recommendations to which objection is made and may

accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

**Dated: November 17, 2015**

*s/ Joseph F. Saporito, Jr.*
**JOSEPH F. SAPORITO, JR.**
**United States Magistrate Judge**